PEELER HARDWARE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5849. Promulgated July 28, 1945.

*C. Baxter Jones, Esq.,* and *L. D. Baggs, Jr., C. P. A.,* for the petitioner.
*Edward L. Potter, Esq.,* for respondent.

**OPINION.**

HILL, *Judge*: The issue is as to the proper valuation of the assets originally belonging to Dunlap in determining petitioner's equity invested capital for the fiscal year ended May 31, 1942. Petitioner seeks to have the value carried as it would have been in the hands of Dunlap. Respondent reduced that amount by $109,508.77 so as to carry the assets at a valuation of $180,000, the purchase price paid by A. M. Peeler for the stock of Dunlap. Section 718 of the Internal Revenue Code provides that, in the determination of the equity invested capital for the excess profits credit, property paid in for stock or as paid-in

surplus or as a contribution to capital shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange.[1]

It is petitioner's contention that once A. M. Peeler had purchased the entire stock of Dunlap he caused a tax-free reorganization between the petitioner and Dunlap. If we were to consider the various steps as a part of one plan of reorganization, we could not begin the consideration of those steps *after* the acquisition by A. M. Peeler of the Dunlap stock as urged by petitioner. The conveyance of the assets to petitioner was required by the Dunlap interests in the contract of sale in the event that A. M. Peeler should decide to cause the balance of the purchase price for their stock to be met by causing petitioner to issue preferred stock to them. Thus, if there were a reorganization, it would have to commence with the Dunlap sisters having the sole proprietary interest in Dunlap. Their requisite proprietary capacity did not continue into the reorganized company.

The Commissioner determined that the assets were acquired by petitioner from A. M. Peeler as an individual and that A. M. Peeler acquired the assets in the complete liquidation of Dunlap. The evidence tends to support the Commissioner's determination.

It would appear that at the time of the transaction in 1930 A. M. Peeler and the petitioner had no interest in bringing about a tax-free reorganization. On brief the petitioner states that the Dunlap sisters had no such interest. In short, there is no showing that there was any plan of reorganization to which petitioner and Dunlap were parties or that what was done was pursuant to a plan of reorganization. On the contrary, Peeler simply liquidated Dunlap. Then, in his capacity as sole stockholder and director, he caused the petitioner to recognize him as the individual owner of the assets and to take over the assets from him personally. This may be seen from the resolution of the petitioner in accepting the assets:

---

[1] SEC. 717. DAILY INVESTED CAPITAL.

The daily invested capital for any day of the taxable year shall be the sum of the equity invested capital for such day plus the borrowed invested capital for such day determined under section 719.

SEC. 718. EQUITY INVESTED CAPITAL.

(a) DEFINITION.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

\*     \*     \*     \*     \*     \*     \*

(2) PROPERTY PAID IN.—Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined in the same manner as if the property were still held at the beginning of such taxable year. If such unadjusted basis is a substituted basis it shall be adjusted, with respect to the period before the property was paid in, in the manner provided in section 113 (b) (2) :

WHEREAS, A. M. Peeler, the President of Peeler Hardware Company and the sole stockholder of Peeler Hardware Company, except for four qualifying shares issued to directors of said company. has acquired all of the assets of Dunlap Hardware Company subject to the liabilities of said company, and

WHEREAS, said A. M. Peeler has proposed to turn said assets of said Dunlap Hardware Company over to this corporation, subject to the liabilities so assumed by him, and

\* \* \* \* \* \* \*

NOW, THEREFORE, be it resolved that the said assets be accepted and that the liabilities of Dunlap Hardware Company be assumed and that the additional shares of common stock and all of the preferred stock to be issued in accordance with the resolution heretofore adopted by the stockholders of this company be issued and delivered to said A. M. Peeler or his nominee or nominees in exchange for the assets of said Dunlap Hardware Company.

A further indication that A. M. Peeler considered Dunlap as liquidated may be seen in his statement at the trial that the shares of Dunlap were canceled. He was questioned further as to this by his counsel as follows:

Q. When you made the statement a few minutes ago that they were cancelled, I take it you were not referring to any active cancellation.

A. No. That was just a slip—I mean, you say a thing was cancelled, and given back to you. Something like that.

Peeler considered the situation to be the same as though there had been such a cancellation.

Thus, with no reason to bring about a tax-free reorganization at the time, A. M. Peeler did not seek to do so. Although there was no formal cancellation of the shares of Dunlap, his testimony and the resolutions of the petitioner made under his guidance indicates that Dunlap was liquidated, and that A. M. Peeler personally became the owner of the assets and thereafter conveyed those assets to petitioner. The taking of formal action to liquidate the corporation was not essential. *Kennemer* v. *Commissioner*, 96 Fed. (2d) 177, 178; *Tootle* v. *Commissioner*, 58 Fed. (2d) 576. It is only now, 12 years later, when the equity invested capital credit of the excess profits tax makes it tax wise for the earlier transaction to have been carried out by means of a tax-free reorganization that petitioner seeks to force the steps there taken into conformity with the requirements of section 112 of the Revenue Act of 1928. The petitioner may not reconstruct now what was done 12 years earlier in order to gain a tax benefit. No formal corporate action of any sort was taken by Dunlap. The fact that the petitioner corporation took the proper formal action in its resolution to take over the assets of Dunlap indicates that A. M. Peeler knew the proper method of having Dunlap convey its assets to petitioner had he desired to effect the transaction in that way. Instead, he caused petitioner, through its resolutions, to recognize him as the individual owner of the assets formerly belonging to Dunlap.

The Dunlap sisters wanted to sell their business. When they set a price of $180,000, the purchaser assuming all liabilities of that company, it was immaterial to them whether it be the assets themselves that were sold for that price or whether the sale be of the shares of stock. When A. M. Peeler liquidated Dunlap and received the assets, they took on a basis in his hands of $180,000, their fair market value at that date. *Gloyd* v. *Commissioner*, 63 Fed. (2d) 649; certiorari denied, 290 U. S. 633; *Anna L. Dirkson, Executrix*, 24 B. T. A. 1152; *Benjamin H. Read*, 6 B. T. A. 407. When A. M. Peeler then conveyed these assets to petitioner in return for the issuance of stock to himself and to his nominees, the transaction came within the provisions of section 113 (a) (8) of the Revenue Act of 1928.[2] The petitioner's basis for the assets became $180,000. We accordingly hold for the respondent on this issue.

## *Issue II.*

Petitioner paid T. B. Peeler, its vice president and secretary-treasurer, salaries of $11,625, $10,091.49, and $10,225, respectively, for its fiscal years 1940, 1941, and 1942. Respondent has disallowed any deductions for this item over $6,120.60 for 1940, $6,387.60 for 1941, and $7,444.80 for 1942.

T. B. Peeler is the son of A. M. Peeler, the president and only other executive officer of petitioner. Petitioner has been allowed deductions of $25,000 for each of the three years in question for salary paid to A. M. Peeler. T. B. Peeler owns 259 of the outstanding 1,625 shares of capital stock of petitioner. The remaining shares, except qualifying shares in the hands of the directors, are owned by his father.

Since completion of his education in 1933, at the age of 21, T. B. Peeler has devoted his entire time to the business. Prior to that time and since childhood he had been working in the business during his vacations. Starting at a salary of $10 a week in 1933, he was transferred from one department to another in order that he might learn the business, both wholesale and retail, and be prepared eventually to take over its management. As he moved from one department to an-

---

[2] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) PROPERTY ACQUIRED AFTER FEBRUARY 28, 1913.—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(8) SAME—CORPORATION CONTROLLED BY TRANSFEROR.—If the property was acquired after December 31, 1920, by a' corporation by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

other he retained supervision over each of the departments in which he had worked. In 1935 he was made a director of the company and in 1936 its vice president. In 1936 he revised the operating methods in petitioner's retail store, putting in many new lines of merchandise, which resulted in an increase in sales volume, and instructed the salesmen in the best method of demonstrating and selling the new lines. He improved the company's relationship with its customers by re-pricing all the merchandise and eliminating the earlier practice of permitting the salesmen to compete with each other for customers by setting lower prices. In 1940 he was given the additional duty of assigning priority ratings to all priority merchandise, this constituting a majority of all goods handled. It was also his function to allocate scarce merchandise between the wholesale and retail departments and between particular customers. Since 1938 he has been in charge of all of petitioner's advertising. In addition to supervising all of petitioner's buying, both wholesale and retail, he directly made 25 percent of the purchases.

The secretary-treasurer was unable to perform his designated functions during 1940 due to ill health. These duties were taken over at that time by T. B. Peeler, who was elected to the office in 1941 and for the subsequent years in question.

Since 1934 the total annual compensations paid T. B. Peeler by the petitioner have been as follows:

| | | | |
|---|---|---|---|
| 1934 | $1,068.30 | 1939 | $11,625.00 |
| 1935 | 3,782.00 | 1940 | 11,625.00 |
| 1936 | 4,570.00 | 1941 | 10,091.49 |
| 1937 | 11,765.00 | 1942 | 10,225.00 |
| 1938 | 11,600.00 | 1943 | 10,225.00 |

During the years in question petitioner paid five of its salesmen the following amounts:

| | 1940 | 1941 | 1942 |
|---|---|---|---|
| A. P. Tucker | $7,175.68 | $8,158.31 | $11,036.88 |
| A. J. Johnson | 8,090.89 | 8,541.78 | 12,022.84 |
| W. C. Slocumb | 10,267.97 | 11,984.89 | 15,545.75 |
| C. E. Hermitage | 6,239.99 | 7,629.72 | 11,531.43 |
| G. M. Yates | 13,117.73 | 14,266.84 | 19,889.14 |

These were gross amounts, out of which the salesmen paid their own expenses. The net pay of the salesmen was not more than 20 percent below these figures. T. B. Peeler was capable of earning more as a salesman than he was actually paid, but his services were more valuable to petitioner in relieving A. M. Peeler of managerial responsibility and so he was not permitted to go out on the road.

The growth in petitioner's business and the comparative growth in the retail department following the improvements made therein by T. B. Peeler may be seen from the following:

| Year | Gross | Retail | Wholesale | Percent of retail to total |
|---|---|---|---|---|
| 1936 | $734,189.45 | $226,416.33 | $507,773.12 | 30.8 |
| 1937 | 987,887.09 | 285,172.88 | 702,714.21 | 28.9 |
| 1938 | 771,209.40 | 262,889.41 | 508,319.99 | 34.1 |
| 1939 | 711,349.45 | 272,131.30 | 439,218.15 | 38.3 |
| 1940 | 866,633.34 | 303,988.81 | 562,644.53 | 35.1 |
| 1941 | 1,004,324.32 | 377,901.40 | 626,422.92 | 37.6 |
| 1942 | 1,423,810.45 | 543,697.93 | 880,112.52 | 38.2 |
| 1943 | 1,501,310.35 | 559,334.61 | 941,975.74 | 37.3 |

The net income before officers' salaries and officers' salaries during the years in question was as follows:

| Year | Net income | Officers' salaries |
|---|---|---|
| 1940 | $64,909.05 | $42,010.00 |
| 1941 | 59,620.87 | 35,283.12 |
| 1942 | 101,398.23 | 35,200.00 |
| Total | 225,928.15 | 112,493.12 |

The growth in surplus was as follows:

Year ended—      Surplus
May 31, 1939 ___ $248,260.87
May 31, 1940 ___ 267,941.11
May 31, 1941 ___ 286,497.94
May 31, 1942 ___ 329,171.59

For the last two years under consideration, T. B. Peeler's compensation was fixed by the board of directors of the corporation. We find that the salaries paid to T. B. Peeler for the years in question were reasonable.

*Decision will be entered under Rule 50.*