Hammond Lead Products, Inc. v. Commissioner.
Hammond Lead Products, Inc. v. Commissioner
Docket No. 913-67.
United States Tax Court
T.C. Memo 1969-14; 1969 Tax Ct. Memo LEXIS 284; 28 T.C.M. (CCH) 54; T.C.M. (RIA) 69014; January 16, 1969, Filed Lester M. Ponder, 1313 Merchants Bank Bldg., Indianapolis, Ind., and Owen Crumpacker for the petitioner. Wayne I. Chertow and James J. McGrath, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year Ended
Deficiency
July 31, 1963
$22,016.48
July 31, 1964
34,043.96
July 31, 1965
43,738.93
After concessions by both parties, the sole remaining issue is whether amounts paid by petitioner to its two chief executives constituted reasonable compensation, deductible under section 162, Internal Revenue Code *285 of 1954. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. Hammond Lead Products, Inc. (herein referred to as petitioner), was incorporated under Indiana law on August 22, 1930. Its principal office and place of business has always been in Hammond, Indiana. Petitioner filed its Federal corporation income tax returns on the accrual method of accounting for its fiscal years ended July 31, 1963, 1964 and 1965 with the district director of internal revenue at Indianapolis, Indiana. William Wilke, Jr., a graduate of Cornell University with a degree in engineering began a career in the lead processing industry in 1915. From 1919 to 1929 he was president of Metals Refining Company, Hammond, Indiana, which produced lead oxide for storage batteries, litharge, and red lead. He and his brother, Erwin L. Wilke, were the chief executives and stockholders of that corporation. Their father, a chemical engineer with considerable experience in metal processing, provided helpful technical advice to the company without charge. In 1929, the Glidden Company *286 purchased Metals Refining Company and retained William Wilke, Jr., and Erwin L. Wilke as chief executives. Within a year, however, the two left Metals Refining Company and organized petitioner, which began operations in December 1930. William Wilke, Jr., was petitioner's first president and served in that capacity until 1965 when he became chairman of the board. Erwin L. Wilke served as secretary-treasurer of petitioner until his death in 1954. At the time petitioner was organized, William Wilke, Jr., and Erwin L. Wilke owned essentially the entire stock in the corporation. On November 7, 1930, 75 shares of petitioner's stock were issued to William Wilke, Jr., and 275 additional shares were caused by him to be issued as gifts to his wife and children (50 of such shares were issued to William P. Wilke, III). On July 26, 1937, William Wilke, Jr., gave 50 shares of petitioner's stock to his daughter Margo, who was born after 1931. William P. Wilke, III, son of William Wilke, Jr., received an engineering degree from Cornell University in 1934 and worked thereafter with Bethlehem Steel Company. While an employee of Bethlehem Steel he, jointly with a co-worker, obtained a patent on a *287 method of lubricating cold reducing mills which was less expensive than the prevailing methods. After service with United States Ordnance Department during World War II, he became a full-time employee of petitioner in 1943 and has continued with petitioner to the present time, becoming plant superintendent in 1945, plant manager in 1950, vice president in 1953, secretary-treasurer in 1954 (upon the death of Erwin L. Wilke), and president in 1965. At the beginning of its operations, petitioner's primary product was red lead. By 1943 it produced both litharge and red lead, primarily for the battery industry. In 1950, William Wilke, Jr., and William P. Wilke, III, jointly decided that petitioner should begin producing lead silicates and white lead. The lead oxides and silicates produced by petitioner are of ultrahigh purity for use largely in the glass and ceramic industries. Petitioner must have different processes to produce the particular quality of lead required by customers in their manufacture of various types and qualities of glass products. Such 56 production processes must be carefully controlled and constantly refined and improved so as to keep pace with the advanced technology *288 of customers and to remain competitive with the large producers and importers in the industry. The lead oxide industry is highly competitive with generally low profit margins. The Metals Refining Company division of the Glidden Company discontinued manufacturing all lead oxides in 1951 because of the division's inability to meet the Glidden Company's profit standards. Today about 60 percent of the tonnage produced by petitioner consists of products not produced when William P. Wilke, III, joined the company in 1943. William Wilke, Jr., and William P. Wilke, III, have functioned as petitioner's chief executive team since 1954 formulating jointly all of its programs and policies. William Wilke, Jr.'s services were focused primarily on sales, finance and lead purchasing while William P. Wilke, III, was primarily concerned with general administration, production, new equipment and product development, sales and lead purchasing. Both were deeply dedicated to petitioner's successful operation and devoted their entire work to that end. Neither had any other business connection or employment. During the years in issue, William P. Wilke, III, directly supervised petitioner's production *289 from a technical standpoint in an effort to maintain a high level of quality, to provide for the changing individual needs of its customers, and to discover more efficient methods of production. He was assisted by a well-trained and effective technical staff. As a consequence of these efforts, he has collaborated, during his association with petitioner, in the development of production techniques which have been used by petitioner as secret processes or have been patented and assigned to petitioner. He is coholder of United States and Canadian patents relating to a corrosion inhibitive pigment which has had widespread use in the paint and plastics industries. A secret process developed by him which practically eliminated the problem of corrosion of furnace parts in the manufacture of lead silicates was made available to petitioner's valuable customers upon their agreement not to disclose the process. He has received no royalties from petitioner for the use of any inventions or secret processes developed by him. William P. Wilke, III, obtained a pilot's license in 1954 so that he could fly petitioner's airplane on business trips. During the years in issue he was the sole pilot for *290 the plane and made numerous flights in it in order to transact sales, to purchase lead, to provide production assistance for customers and to attend industry association meetings. William P. Wilke, III's ability to pilot petitioner's airplane enabled him to quickly respond to emergency calls from customers, especially in areas where commercial air transportation was not readily available. He holds an instrument license which permits him to fly in any weather suitable for commercial airlines. William P. Wilke, III, is, and was during the years in issue, a member and director of the Lead Industry Association and a member of the American Ceramics Society. He appeared as a witness on behalf of the lead processing industry in hearings before the United States Tariff Commission in 1960 and 1962 regarding the "dumping" of lead products in the United States by foreign government subsidized producers. Perhaps the single most important aspect of the success of petitioner's operations over the years has been the advantageous purchase of raw materials, principally lead, whose cost comprises approximately 85 percent of the gross sales price of all of petitioner's products. The lead market, *291 which is international in scope, is sensitive to both domestic and foreign factors, as well as to day-to-day market changes, and, as a result, is subject to wide fluctuations. The problems raised by such fluctuations are complicated by the necessity that petitioner keep sufficient inventory on hand to meet unusual conditions. It was petitioner's practice to "cover" its customers' anticipated inventory needs at the current price of lead, so that in a fluctuating market petitioner stood to make substantial gains or losses directly on its inventory depending upon the skill with which its lead purchases on the market were made. Petitioner purchased lead not only from domestic suppliers but also from European, South American and Australian sources. In response to a marked drop in the price of lead in 1962, William Wilke, Jr., 57 and William P. Wilke, III, jointly determined that petitioner's inventory should be substantially increased. They advised their customers to do the same. During the years in issue, when the price of lead, New York delivery, increased from 10.32 cents per pound to 16 cents per pound, petitioner had a 9,000 ton inventory at a LIFO average cost of 9.5 cents per *292 pound. This single judicious decision was a critical factor in the profits earned by petitioner during the years in issue. From its inception, petitioner's success was largely a result of careful coordination of sales forecasts with inventory control. From the time he became an employee of petitioner, William P. Wilke, III, worked closely with William Wilke, Jr., in studying the lead market, and all decisions relating to lead purchases were made jointly with him. William Wilke, Jr., had the benefit of his father's experience to complement the personal contacts and knowledge gained on his own during his almost 50 years in the lead industry. William P. Wilke, III, had additional contacts and experience which were valuable in the decision making. During the years in issue he was a consultant for Southeastern Lead Company, a customer of petitioners, and purchased lead for them at a commission of $1 per ton of their lead oxide sales. John S. Nordyke functioned as petitioner's vice president in charge of sales during the years in issue. In 1965, Willard F. Haas, son-in-law of William Wilke, Jr., became treasurer and Ruth C. Sliger became secretary. During the years in issue the petitioner *293 paid the following amounts to William Wilke, Jr., and William P. Wilke, III, and deducted the amounts as compensation of officers on its Federal income tax returns: *64
Year Ended July 31
1963
1964
1965
William Wilke, Jr
$61,205.19
$75,829.40
$89,478.33
William P. Wilke, III 61,115.79
75,607.11
90,500.42
$122,320.98
$151,436.51
$179,978.75 In addition, petitioner made contributions to a pension trust for the benefit of William Wilke, Jr., and William P. Wilke, III, in the amount of $3,250 apiece for each of these years. The payments to William Wilke, Jr., were based upon a formula with three factors: a base pay of $10,000, 5 percent of net profits (computed upon a FIFO inventory method), and $1 per ton of sales. The formula used for William P. Wilke, III, was identical except that in the third factor the $1 payment was applied per ton of production. The amounts paid to the two officers during these years were computed by an outside accountant who did not receive any instructions on computation from the officers or board of directors of petitioner. At the time the Glidden Company bought the stock of Metals Refining Company, William Wilke, *294 Jr., and Erwin L. Wilke, the principal officers of Metals Refining Company, were paid salaries of $15,000 plus 5 percent each of the net profits. At that time the yearly net profit of Metals Refining Company was approximately $100,000. The Glidden Company retained this compensation formula after it gained control of Metals Refining Company. On February 9, 1931, the board of directors of petitioner in a formal resolution set William Wilke, Jr.'s compensation at $1 per ton of all material sold and shipped plus 5 percent of the net profits. Erwin L. Wilke's compensation was set at $1 per ton of all material manufactured and ready for shipment plus 5 percent of the net profits. No formal action was taken thereafter in setting the rate of compensation of petitioner's officers. In 1937, petitioner began paying William Wilke, Jr., and Erwin L. Wilke a "special salary" of $5,000 each per year, which was raised to $7,500 per year in 1941 and to $10,000 per year for William Wilke, Jr., in 1953. When William P. Wilke, III, became secretary-treasurer in 1954 he was compensated on the basis of the formula previously used for Erwin L. Wilke, including a "special salary" at the rate of $7,500 *295 per year. His "special salary" was raised to $10,000 in 1954. While the 5 percent of net profits under the compensation formula was computed on the FIFO inventory method, petitioner's 58 net income for Federal income tax purposes was computed on the LIFO method. When petitioner was allowed by the revenue laws to change to the LIFO method for Federal income tax purposes in 1947, it did so but chose not to alter its method for compensation formula purposes for two reasons: (1) for the sake of consistency and continuity, and (2) to permit monthly calculations of compensation of officers which would fairly reflect percentages of net profits actually earned during the month. When prices of raw materials, such as lead, are increasing, the use of the FIFO method in computing income will generally result in higher income than the LIFO method. During the years in issue the following amounts of compensation were paid to other officers of petitioner: 1963
1964
1965
John S. Nordyke, Vice President
$22,000
$26,325
$25,775.00
Willard F. Haas, Treasurer
24,575.00
Ruth C. Sliger, Secretary The following contributions were made to petitioner's qualified *296 pension trust for its officers: 1963
1964
1965
William Wilke, Jr
$3,250
$3,250
$3,250.00
William P. Wilke, III
3,250
3,250
3,250.00
John S. Nordyke
1,852.50
Willard F. Haas
1,132.50
Ruth C. Sliger
914.95
During the years in issue the petitioner had one class of stock, common, of which 1,075 shares were issued and outstanding during its taxable years 1963 and 1964 and 1,100 shares issued and outstanding during the taxable year 1965. Ownership of the shares is reflected below: Shares
Shares
1963-
1964
1965
William P. Wilke, III
50
60
Erwin L. Wilke, Trusts (William P. Wilke, III, Trustee)
225
225
Marie R. Wilke (Widow of Erwin L. Wilke)
250
250
Martha Wilke (former wife of William Wilke, Jr., and mother of William P. Wilke, III)
130
130
Henry P. Wilke (brother of Wil- liam Wilke, Jr.)
25
25
Margo K. Wilke, (daughter of William Wilke, Jr.)
50
50
Virginia M. Wilke (daughter of William Wilke, Jr.)
50
50
Martha Meyn Wilke (daughter of William Wilke, Jr.)
50
50
Nancy W. Haas and Willard F. Haas (daughter and son-in-law of William Wilke, Jr.)
50
50
Katherine G. Schuyler
71
71
Jannette E. Groman
66
66
Ruth Groman Meyers
12
12
Dorothy G. O'Keiffe
21
21
Willard F. Haas
4
John S. Nordyke
4
Peter F. Murphy, (Trustee for Terrence Murphy, a minor)
4
Ruth C. Sliger 3
1,075
1,100
*297 From 1937 through 1965 petitioner has continuously paid cash dividends except for the years 1941 and 1951. The following schedule reflects petitioner's sales, taxable net income, Federal income tax, net income using the FIFO inventory method, net worth, cash dividends, and compensation of William Wilke, Jr., William P. Wilke, III, and Erwin L. Wilke (died 1954) for each of the taxable years ended July 31, 1931, through July 31, 1967: 59 Taxable Year Ended 7/31
Sales in
Sales in Tons
Taxable
Taxable
Net Income
Net Income [1]
Year
Before
Federal
Per FIFO
Ended
Sales
Federal
Income Tax
Inventory
7/31
Sales in
in Tons
Income Tax
Per Return
Method
1931
$188,036.98
$328.84
$ -0-
1932
422,068.03
10,330.05
1,195.05
1933
448,785.20
46,518.05
6,396.23
1934
6 01,463.25
46,040.13
6,450.89
1935
620,000.44
52,407.42
7,206.02
1936
856,554.94
73,661.89
10,128.51
1937 1,250,735.10
82,550.08
11,700.44
1938
1,005,107.73
29,248.82
3,442.35
1939
1,257,852.62
10,277
83,323.07
14 ,218.88
1940
1,391,780.53
10,864
88,881.47
16,081.23
1941
1,720,655.65
12,893
95,002.96
22,800.71
1942
1,742.35 3.88
11,622
102,107.83
30,507.54
1943
1,575,413.93
9,856
78,277.39
31,310.96
1944
1,947,602.58
12,248
101,389. 50
36,938.89
1945
2,417,369.64
15,189
138,348.42
37,774.96
1946
2,871,563.64
17,683
244,021.95
70,041.14
1947
4,006,520.59
14,242
n2 115,818.91
42,072.74
$ 348,035.93
1948
5,105,893.67
14,799
422,478.47
160,541.82
382,385.98
1949
3,817,492.84
9,565
100,598.87
36,757.92
5,145.9 4
1950
3,101,132.03
10,986
26,171.37
5,256.56
(26,526.01)
1951
5,123,490.67
14,428
68,471.03
25,876.11
291,763 .10
1952
4,475,410.76
11,218
106,086.52
47,330.68
97,678.70
1953
3,713,083.79
11,733
207,440.20
99,999.34
30,8 34.23
1954
4,008,711.95
13,142
130,295.08
60,476.27
151,235.03
1955
4,897,011.65
14,837
197,185.99
97,036.72
2 83,055.70
1956
5,904,424.10
16,949
252,046.97
125,564.23
331,515.84
1957
5,510,783.58
15,564
278,011.22
139,048 .46
193,514.08
1958
4,444,119.05
14,914
183,731.84
90,040.56
21,905.78
1959
4,751,317.05
17,282
255,021.27
125 ,622.20
272,538.67
1960
5,410,905.59
18,840
257,696.43
128,502.14
346,807.46
1961
5,188,566.03
13,637
410,779.1 7
208,105.17
268,438.32
1962
5,138,962.38
20,281
360,709.06
175,673.96
309,688.96
1963
4,497,820.03
17,558
270 ,426.45
135,121.76
482,491.06
1964
6,036,777.42
20,566
257,948.23
122,403.96
700,499.83
1965
7,716,645.96
22,76 7
342,120.81
158,259.21
898,223.25
1966
9,128,553.86
25,579
792,803.19
356,951.18
613,800.90
1967
7,066,205.41
21,473
487,836.59
225,652.49
281,831.54
*298 60 *64
Compensation of:
Taxable
Erwin L.
William P.
Year
Cash
Wilke
Wilke, III
Ended
Dividends
William L.
(Died in
(Became an
7/31
Net Worth
Paid
Wilke, Jr.
1954)
Officer 1954)
1931
$107,540.90
-0-
$1,686.05
$1,775.99
-0-
1932
116,675.90
-0-
5,453.21
5,604.18
-0-
1933
156,797.72
-0-
8,167.30
8,206.86
-0-
1934 196,109.13
-0-
9,163.03
9,116.15
-0-
1935
240,710.21
-0-
10,567.95
10,537.80
-0-
1936
303,148.91
-0-
17,489.42
17,345.33
-0-
1937
307,989.03
$ 64,500.00
20,391.30
20,644.44
-0-
1938
301,163.56
32,250.00
15,613.13
15,7 92.18
-0-
1939
342,748.57
32,250.00
20,758.69
20,050.54
-0-
1940
382,112.03
32,250.00
22,078.41
22,419.63
-0-
1941
454,101.68
-0-
26,994.62
27,493.52
$ 1,004.00
1942
504,345.79
16,125.00
25,760.35
25,904.45
4,088.46
1943
534,967.02
16,125.00
22,984.08
22,106.30
5,853.00
1944 575,032.02
16,125.00
26,857.24
27,509.18
7,496.29
1945
618,154.85
16,125.00
31,378.75
30,753.81
8,473.04
1946 722,573.29
16,125.00
39,559.91
39,354.58
14,030.31
1947
770,268.52
32,250.00
42,702.97
43,140.49
13,509.77
19 48
961,626.15
107,500.00
45,113.06
44,985.71
13,962.68
1949
934,074.68
53,750.00
28,454.22
28,620.82
12,216.37 1950
889,454.87
53,750.00
24,346.91
24,269.51
12,583.64
1951
911,924.22
-0-
46,418.07
47,044.23
15,273.78
1952
916,505.86
53,750.00
31,276.84
31,763.67
13,950.07
1953
969,730.92
53,750.00
27,827.35
25,039.80
[3] 17,016.35
1954
1,002,102.93
53,750.00
33,982.03
17,085.09
25,769.31
1955
1,052,299.57
53,750.00
43,711.35
-0-
43,982.8 1
1956
1,129,588.96
53,750.00
49,029.44
-0-
48,211.53
1957
1,218,978.83
53,750.00
40,547.28
-0-
40,721.32
1958 1,259,267.61
53,750.00
32,232.95
-0-
32,931.88
1959
1,334,984.63
53,750.00
47,520.36
-0-
46,780.39
1960
1,40 8,804.87
53,750.00
53,231.07
-0-
53,039.77
1961
1,557,475.70
53,750.00
49,811.72
-0-
50,534.73
1962
1,691,583. 87
53,750.00
53,072.15
-0-
52,548.40
1963
1,776,037.71
53,750.00
61,205.19
-0-
61,115.79
1964
1,806,165.18
10 7,500.00
75,829.40
-0-
75,607.11
1965
1,921,451.94
107,500.00
89,478.83
-0-
90,500.42
1966
2,254,668.66
110,000.00
76,555.05
-0-
76,439.39
1967
2,416,570.36
110,000.00
58,082.18
-0-
59,462.53
*299 61 Edmund P. Palmer, a lawyer who was assigned to the War Production Board during World War II, served as the general manager of the Metals Refining Company division of the Glidden Company from 1948 to 1968. In such capacity he had the sole responsibility for purchasing the raw metals used by the company, viz., copper, lead, tin and iron. In addition, he worked closely with and coordinated the activities of the research, sales and production divisions of the company. His performance was in turn supervised by various vice presidents of the Glidden Company. After 1951 when the Metals Refining Company discontinued production of all lead oxides, Edmund P. Palmer continued to purchase a lower grade of lead for the manufacture of lead powders. For the years 1962, 1963 and 1964, he was paid an average salary of approximately $20,000 per year. Respondent determined that the amounts paid William Wilke, Jr., and William P. Wilke, III, during the years in issue were unreasonable to the extent *300 they exceeded the following amounts: *64
Year Ended July 31
1963
1964
1965
William Wilke, Jr
$33,000
$35,500
$38,000
William P. Wilke, III
50,000
54,000
58,000
Ultimate Findings The amounts paid by petitioner to William Wilke, Jr., and to William P. Wilke, III, constituted reasonable compensation to the following extent: *64
Year Ended July 31
1963
1964
1965
William Wilke, Jr
$43,039.86
$55,263.45
$66,711.76
William P. Wilke, III
61,115.79
75,607.11
90,500.42
Opinion Respondent and petitioner disagree on whether the amounts paid to William Wilke, Jr., and William P. Wilke, III, during the years in issue constituted "reasonable [allowances] for salaries or other compensation for personal services actually rendered" within the meaning of section 162(a)(1). [2] Petitioner has the burden of showing that the amounts disallowed by respondent were in fact reasonable compensation and, thus, ordinary and necessary expenses. Botany Worsted Mills v. United States 278 U.S. 282 (1929). The issue is factual. *301 "Reasonableness" is a relative standard which may be used to measure an absolute such as an amount of compensation only after observation of surrounding facts which place the absolute in perspective. As a result, several criteria have evolved as guides in determining for purposes of section 162 the reasonableness of compensation in particular cases. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115 (C.A. 6, 1949); 4A Mertens, Law of Federal Taxation §25.69 et seq. (1966 rev.). Although we refer specifically only to those factors upon which we place the greatest reliance, we have considered all relevant criteria in reaching our conclusion. Both William Wilke, Jr., and William P. Wilke, III, were well-educated, possessed valuable technical know-how, experience and customer contacts, and devoted their entire working efforts to petitioner's business. Under their leadership petitioner prospered in a highly competitive industry. See The Hof Brau Co., 6 B.T.A. 442 (1927). Without question, both of them rendered valuable services to petitioner for which they were entitled to substantial compensation. Adams Tooling, Inc., 33 T.C. 65 (1959), affd. *302 289 F. 2d 554 (C.A. 7, 1961). It does not appear, however, that the compensation of the two officers was fixed pursuant to a "free bargain" between petitioner and the officers made before the services were rendered within the meaning of section 1.162-7(b)(2), [3] Income Tax Regs., as petitioner contends. *303 62 The basic formula upon which the two principal officers' compensation was based was formally adopted by petitioner in 1931, at which time it appears that William Wilke, Jr., and Erwin L. Wilke owned substantially all of the corporation's stock. Certainly this contractual arrangement which was carried forward informally through the years in issue was not a product of "free" or "arm's-length" bargaining. Adams Tooling, Inc., supra.Moreover, it is clear that acquiescence in the arrangement by petitioner's board of directors during the years in issue was insufficient to bring the bargain within the intendment of the regulations even if we were to assume, but which has by no means been established, that William Wilke, Jr., and William P. Wilke, III, did not have effective control over petitioner's stock at that time. Consequently, we reject petitioner's contention that the reasonableness of the compensation of petitioner's officers should be judged by the same standards applied to widely-owned corporations. Compensation paid for "like services by like enterprises under like circumstances" is a helpful guide in determining reasonableness. [4] The only salary appearing *304 in this record [5] for comparison is the approximately $20,000 per year paid during the years in issue to the general manager of Metals Refining Company. Dissimilarities in the services he performed and in the circumstances under which he was employed from those appearing in the instant case render his salary inadequate as a standard of reasonableness. He did not bear the ultimate responsibility for those policy decisions critical to the success or failure of an enterprise as did William Wilke, Jr., and William P. Wilke, III. Neither did he found Metals Refining Company and provide 30 years of continuous able leadership nor did he develop valuable processes and render special services such as piloting the company airplane. See Peeler Hardware Co., 5 T.C. 518 (1945), affd. 155 F. 2d 974 (C.A. 5, 1946); California Vegetables Concentrates, Inc., 10 T.C. 1158 (1948). It should be noted in this context that while Edmund P. Palmer was general manager of Metals Refining Company, the company discontinued production of lead oxides because of inadequate profit margins. *305 No expert testimony was offered by either party as to the reasonableness of the compensation in controversy. Petitioner had a very high return (an average of almost 250 percent) on its outstanding capital stock after payment of officers' compensation, Olympia Veneer Co., 22 B.T.A. 892 (1931), and it consistently paid substantial dividends from the inception of its operations, including the years in issue. From the foregoing, we think the petitioner has satisfied its burden of showing that a portion of the compensation expense deduction disallowed by respondent for each of the years in issue was in fact a "reasonable allowance for compensation." Recognizing the impossibility of complete accuracy, we have found as a fact, after a careful review of all the evidence in this record, that the amounts paid by petitioner to William Wilke, Jr., constituted reasonable compensation to the extent of $43,039.86 in 1963, $55,263.45 in 1964 and $66,711.76 in 1965, and the amounts paid to William P. Wilke, III, constituted reasonable compensation to the extent of $61,115.79 in 1963 $75,607.11 in 1964 and $90,500.42 in 1965. [6]
*306 Decision will be entered under Rule 50. 63 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
1. Not reduced by Federal income tax. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
[2]↩ Taxable income reported in Federal income tax returns on LIFO inventory method beginning 8-1-46 -- prior years on FIFO method.
3. Salaries of William P. Wilke, III, for years prior to fiscal year 1954 were as an employee before he became an officer and assumed the duties of Erwin L. Wilke. 61 of Erwin L. Wilke.↩
3. Sec. 1.162-7(b), Income Tax Regs., reads in pertinent part as follows: The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: * * * (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings Taxable on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.↩
4. Section 1.162-7(b)(3), Income Tax Regs., provides as follows: In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned. ↩
5. Edmund P. Palmer testified by way of deposition as to his salary during the course of respondent's cross examination and was properly the subject of cross examination. See Summit Drilling Corp. v. Commissioner, 160 F. 2d 703↩ (C.A. 10, 1947), affirming a Memorandum Opinion of this Court.
6. The difference between the amounts determined reasonable for the two officers is a product of our conclusion that William P. Wilke, III's services were more valuable to petitioner during the years in issue than were those of William Wilke, Jr. Although the responsibility for company policy was shared by them, William P. wilke, III, took a more active role in managing production and in sales and customer service. Our determinations also reflect an additional amount for William P. Wilke, III's contribution of patents and secret processes to the company. In addition, William P. Wilke, III, was then a vigorous, highly competent executive in the prime of life, while William Wilke, Jr., who was then over 75 years of age, was in the twilight of his long and successful business career. Consequently, for the particular years in issue we have found that the elimination of the contingent payment based upon tonnage of lead sold with respect to the formula used for William Wilke, Jr., results in compensation which, under all the circumstances, is "reasonable."↩